McIlvaine, C. J.
, It appears from the testimony, that after It was known to-the parties that Christopher Nolte intended to build upon the lot adjoining the plaintiff’s lot, and that the ■excavation for the cellar thereon would endanger plaintiff’s building, a verbal contract was entered into by and between them. The only evidence concerning the terms of the contract, is found in the testimony of the parties themselves. The substance of plaintiff’s testimony as to the contract was as follows :
“ I am the plaintiff; I hold the premises in question by a lease. T erected the building about four years ago; I verbally ■contracted Avith J. B. H. Nolte to underpin the house; I knew Christopher Nolte was about to build on the adjoining lot, as I had made an estimate and bid on the plans for building said house, the plans being in the possession of the defendant at the time, and I saw the men digging on the lot. Defendant told me at the time the estimate Avas made that he was going to put up the building for his father, Christopher Nolte ; I told him I Avanted him to underpin my house, as he *189 could do it better and cheaper, having his men there; he-agreed to do it; ‘ he said he would attend to it.’ ”
The substance of defendant’s testimony on the same point was as follows:
“ I think diggers were at work the first time when Iiill spoke to me of underpinning ; Miles spoke to me and said his-father wanted to see me about underpinning, I told him I would see him. I met him on the street, he said he wanted me to underpin; I said all right, whenever it is ready let me know, and I will attend to it; this I think was on the corner of Clark and Central Avenue; there was nothing said about protecting the wall, or the house being in danger; he never told me to' protect the building ; I told him to let me know when it was ready, as he was near and I lived at Brighton; I had no other conversation with him about the matter until after the building fell.”
From the whole testimony, it is quite clear that the excavation which caused the plaintiff damage, was done by one Shroeder, under- a contract with Nolle, senior, and that defendant had no interest in said contract, or right to control the performance of the work under it.
In this view of the case, it is contended by plaintiff in error, that the variance between the contract set up in the petition and the one proved on the trial, was fatal to the plaintiff’s right to recover. We think otherwise. If the plaintiff had a cause of action for a breach of the contract proved, it would be no objection to his right to recover, that all the terms of the contract as alleged in the petition, were not sustained by the testimony. This is a mere question of variance.
It also clearly appears from the testimony, that the work of excavating the cellar on Nolte’s lot was progressing at the time the contract between these parties was made. That it was continued until the depth of plaintiff’s foundation had been reached, when the work was suspended for a couple of weeks. In the afternoon of the same day on which the work was resumed, defendant Nolte was on the ground, and seeing that the excavation was below the plaintiff’s foundation, told the diggers that they were too close to the wall of the *190 plaintiff, and then proposed to commence underpinning the next morniqg. This was about 3 o’clock p. m., and about • an hour thereafter the plaintiff’s wall fell in, before the work •of underpinning had been commenced. ■
Conceding, upon this state of facts, that a case was made for the jury to say whether or not the defendant below had failed 'to perform his duty under the contract, it is contended that the judgment and verdict should be set aside for error in this, namely, that the court, against the objection of the defendant, permitted the plaintiff to offer testimony as follows: "
The plaintiff, Hill, having testified in regard to the contract to underpin, was asked by his counsel “ whether or not there was any ‘ general custom ’ when one agreed to underpin a building, as to how it should be done, and as to what his duties were, and if so, what it was. ” The witness answered ■“there is a ‘general custom ’ for the diggers and underpinners to work together when 'the underpinning is made necessary by •excavating the.adjacent lot.”
One Archer, being then called by plaintiff, was asked the following question: “ Under a contract to underpin, what is ■embraced? what is the ‘general custom’ if any, as to the way of doing it ? ”
The witness answered, “ Under the contract to underpin is •embraced to dig off a certain distance from the wall, then dig under, at places, so as to let the mason work, or to take all the earth away and put in timbers to support the stone. When ■one contracts to tinderpin, I leme the matter to him ; this is the general acceptance of such a contract, and includes his following the digging of the adjacent lot, and the contract is made with such an understanding. That is the custom^ Ex•ceptions to both question and answer were taken and overruled.
Again, the following question was asked McKay, a witness for plaintiff:
“ Ques. — If excavations -were going on upon an adjoining lot, and owner make a contract to underpin, what is fhe ‘general custom,’ if any, as to what he, the under *191 ■pinner, shall do % ” to which exceptions were' taken and ■overruled.
“ Ans. — If I, in such case, made a contract to underpin with one, he would have the entire control, and I would trust the building to him.”
And for error in the charge of the court in relation to such testimony. The following is the charge given upon this subject.
“ It is claimed, however, by the plaintiff, that the contract entered into by him with the defendant, obligated the defen d--ant to do whatever Was necessary, as the excavation of the .adjoining cellar progressed, to underpin, and so secure the wall ■of his house ; that that was the contract between him and the ■defendant; and as bearing on this question, there has been evidence introduced before you of house-builders, as to what is the custom, and what is understood when a contract for underpinning a house is made.
“ Now, so far, gentlemen, as you find from the testimony that the general custom — I mean the custom in this business, a ■custom by which persons engaged in this kind of business are controlled habitually — so far as you find a custom to have been used, if there be any indefiniteness in the precise language used by the parties in making their contract; if the details of the contract are not clearly and specifically all provided for in the language of the contract itself, they will be held to have entered into the contract with a view to the custom that existed in that kind of business, and the contract will be interpreted and con.strued by the custom as you find it to have existed at the time. In other words, that they meant to do, on the one hand, and to have done on the other, what it was customary should have been done.
“Proof of the custom must be clear. It must be shown to be uniform, and generally understood by the parties who ■should be affected, usually, by such custom.
“ It is claimed by the plaintiff that the evidence shows that where a contract is entered into between a stone mason and the owner of improved property, whose foundation is about to he injured by an excavation immediately adjoining his prop *192 erty, for the underpinning, by the stone mason, of his wall, to-prevent its receiving injury, or falling, whether he himself has contracted for the digging of the cellar adjoining or not, that, nevertheless, he will make an arrangement with the digger of the cellar, by which they will work together, so as that the underpinner, as the excavation progresses, will he able to put in new foundations to the house without injuring the house, and thus secure it from falling..
“ It is claimed that all the testimony, offered before you in reference to that matter shows that such is the uniform and universal custom with reference to this matter; and if you find from the proof that such is the custom, then the defendant, in case you find the contract to have been made as claimed by the plaintiff, would be held obligated by such a custom, and should be held to the duty of making such an arrangement with the digger of the cellar on the adjoining premises, and co-operating with him as the digging progressed,'so as that he should be able to underpin the wall of the plaintiff, and save it from falling.
“Obviously, gentlemen, it is for the mutual advantage of the party employed to underpin the wall of the adjoining house, and of him who is engaged in digging the cellar for the new house, that the walls should be kept from falling ; that they should work together, one following the other in his work ; for it would be to the advantage of the cellar to prevent the wall from falling into the excavation he is making, and thus impeding his operations; and it would be a reasonable custom, such a custom between the cellar-digger and the underpinner; and if you find in fact that such a custom existed, then it was the duty of the defendant to avail himself of that, and make ■ such an arrangement with the cellar-digger ; and if you find, by the terms of the contract between the plaintiff and the defendant, that there was simply an agreement on the one part by the defendant to underpin the wall of the plaintiff, and to attend to it, and the obligation imposed by the law upon the plaintiff that he should pay his reasonable charges , for doing so, then it would be the duty of the defendant, who undertook to underpin the wall, to watch his *193 opportunity and make provision for tbe fulfillment of his contract, by an arrangement for such purpose with the digger of tbe excavation, by which they should work together, each performing his own functions, and each giving to the other opportunity to attend to his.
“ It is claimed by the plaintiff that the defendant, so far from having taken any steps to make such an arrangement with the digger of this cellar, by which they should co-operate together, neglected utterly, up to the time of the accident itself, to speak to him on the subject, or to make any arrangements whatever with him.
“If you find, gentlemen, that to be the fact, that-in consequence of this neglect the injury has accrued to the plaintiff, you will be warranted in finding a verdict for the plaintiff, if you find the contract to have been made.”
The case before the court presents no question as to the manner in which a contract *bf this kind should be performed. It was not performed at all. Its performance was not commenced by defendant. The" question is, was he negligent in not entering upon its performance, or, in other words, did he neglect any duty to which ho was obligated by the terms of his contract? Had the time arrived for the commencement of the w-ork, aud did he know it? Was he notified by the plaintiff below, or had he such knowledge from his own observation ? And if so, was he guilty of unreasonable delay in commencing work under the contract ? Or was he bound to take notice of the proper time to commence the work ? Was he bound to observe the progress of the work which necessarily preceded liis own ? These questions must be determined by the contract itself, and from the facts and circumstances which surrounded the parties at the time it was made, and which were known to them. If the defendant had control of the preparatory work, it would be reasonable to say that the parties meant thát he should take notice of its progress; otherwise he could not, under such a contract, be considered in default until knowledge, in some way, came to him that the previous work of excavating the cellar had progressed to such a state, that the time had come for him to enter upon the work *194 of underpinning. All these questions should be determined according to the principles of the common law, and not by any general usage of others, much less by any local or particular custom. It appears to us, that the solution of such questions cannot be made to depend upon usage or custom, but, in each case, must be ascertained from the terms of the contract itself construed in the light of its own peculiar circumstances.
But the theory upon which the case was tried in the court below, as we understand, goes still further. The local custom which was injected into this contract (which in terms bound the defendant to underpin plaintiff’s building, and nothing more), obligated him also to contract with the excavator of the cellar upon the adjacent lot, so that the excavating of the cellar and the underpinning of the plaintiff’s house should be wrought together; and the failure to make such arrangement with the excavator, whether he was willing or unwilling to enter into the arrangement, would, constitute a breach of the defendant’s contract. Such a custom, however uniform and long continued, should be declared unreasonable, and therefore of no binding force.
It is also claimed that the damages assessed by the jury were excessive. Upon this point, we need only say, that if the injury to plaintiff’s house could have been repaired so as to restore it substantially to its former state and condition, the cost of such repairs, and not the value of the house, is the proper measure of damages.
Judgment reversed and cause remanded to the court of common pleas for further proceedings.
Johnson, J., dissented from the judgment.